## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        **Plaintiff,**<br><br>**vs.**<br><br>MINDY DORTON,<br><br>        **Defendant.** | **FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER**<br><br><br>**Case No.  2:08CR158 DAK** |

This matter is before the court on Defendant Mindy Dorton's Amended Motion to Suppress.  An evidentiary hearing on the motion was held on September 17, 2008.   After briefing by the parties, closing arguments were heard on October 21, 2008.   At the hearings, Defendant was represented by Mark J. Gregersen, and the United States was represented by Adam S.  Elggren.   Before oral argument, the court carefully considered all pleadings, memoranda, and other materials submitted by the parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to this motion.  Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

### FINDINGS OF FACT

Officer Justin Seitzinger is a patrol officer with the Orem City, Utah Police Department. Transcript of Motion to Suppress Hearing ("Tr.") at 5.   He has been with the department for two years, and had been on the job for three months on the day of the incident in question.  *Id.*  He

had participated in training regarding drug recognition and crisis intervention as of the day of the incident, as well as the standard training undertaken by all law enforcement officers in Utah. Tr. at 6.

On October 27, 2006, Officer Seitzinger was engaged in training and was in the same patrol car with Officer Porter, who had 16-18 years of experience on the force. Tr. at 5-6.   In the very early morning hours of October 27, an informant approached the officers with information that Defendant was selling drugs and forging checks "throughout the city of Orem" that morning. Tr. at 7-8.  The informant offered to tell the officers where they could find Defendant selling drugs.  Tr. at 8.  Officer Porter was already familiar with Defendant through his work with major crimes and undercover narcotics. Tr. at 9.  The officers researched Defendant's criminal history through the Orem City Police Department's internal records system and found that she had multiple arrests, including for forgery and drugs.  *Id*. Officer Seitzinger testified that Defendant had an unusually high number of arrests in Orem city alone. Tr. at 9-10.

At about 5:20 a.m., the informant called Officer Porter's cell phone – which Officer Seitzinger answered – and said he or she knew Defendant's location.  *Id*.  The informant stated that Defendant was in a car, which direction the car was traveling, details about the car's appearance[1] and the license plate number.  Tr. at 10.  At some point, the officers learned that the car, a rental, was possibly a "breach of trust" vehicle – meaning it had been kept by the renter – Defendant – beyond the due date of return.  Tr. at 30.   The officers drove in the direction of

_____

[1]  The car was a rented, white Dodge Stratus, a four-door passenger car. Tr. at 10.

Defendant's vehicle in an attempt meet it.  At some point before encountering the car, they

requested backup in case they missed it.  Tr. at 11.  No backup arrived, however, until the car had

been pulled over and the occupants removed from the car and secured.  Tr. at 17.

Witnesses at the hearing on Defendant's Motion to Suppress (Dkt. No. 14) testified

differently as to how Defendant's car was pulled over.  According to Officer Seitzinger, the two

officers located Defendant's car, and they were behind the car in traffic at the intersection of 300

South and 500 West in Provo.  Tr. at 11.  When the light turned green, Defendant's car made a

left turn without a turn signal.  *Id*.  Officer Porter then turned on the patrol car's overhead lights

and initiated a traffic stop at about 400 West and 300 South.  *Id*.  It was still dark at the time.  Tr.

at 13.  Officer Seitzinger testified that he observed the violation, and he knew that Officer Porter

observed the traffic violation as well because Officer Porter activated the overhead lights despite

no mention of the infraction by Officer Seitzinger.  Tr. at 36.  At some point during the traffic

stop, Officer Porter issued a traffic citation to the driver of the car, Robert Allen Varner, for

Failure to Signal, a violation of Section 41-6a-804 of the Utah Traffic Code. Tr. at 36, 39.

Officer Seitzinger did not know for certain whether Officer Porter talked with Varner about the

traffic violation, but did testify that Officer Porter investigated the violation. Tr. at 28-29.

According to Defendant, however, multiple police vehicles were involved in the stop of

her car, although it is unclear what role the other cars played.[2]  Tr. at 42.  Defendant also testified

---

[2]  The audio recording of the Orem dispatch calls seems to support Officer Seitzinger's version of events.   In that recording, Officer Porter can be heard requesting backup to the vicinity of where Defendant's car was expected to be.  Later, the Orem Police dispatcher can be heard confirming with Officer Porter the location of the traffic stop, then relaying that information to the Provo dispatcher.  Then Officer Porter can be heard telling the dispatcher there are about six occupants in the car and asking her to "expedite" his request for backup. Ex. 1 at

that she believed the driver of the car, Robert Varner, had activated the car's left turn signal at the intersection of 300 South and 500 West, because she remembers the car's signal would not deactivate when the wheel was turned, as on most cars, and that bothered her. Tr. at 43. Defendant testified "[t]o my knowledge, I thought he used the signal." *Id*. Defendant admitted on the stand she had used methamphetamine 12 hours before the incident. Tr. at 46. She also admitted to having been asleep shortly before the car was pulled over. *Id*. Defendant admitted on the stand that she had made false statements to authorities "numerous" times. Tr. at 49. Having considered the testimony of Officer Seitzinger and of Defendant, the court credits Officer Seitzinger's recollection of events regarding the traffic stop.

After the Stratus was stopped at the side of the road, the officers used spotlights to illuminate the car. Tr. at 13-14. The officers were able to clearly see the occupants of the vehicle, and, because the occupants were moving quite a lot, it appeared to Officer Seitzinger there were about six people in the car, although there were actually five. Tr. at 14-15. The officers began to approach the car and yelled to the occupants to stop moving. *Id*. The Officers ordered them to put their hands on the ceiling of the car. *Id.* The movement, however, continued. Tr. at 15. Officer Seitzinger drew his weapon as he continued to approach the car on the passenger side, still ordering the occupants to stop moving. Tr. at 15-16. The occupants of the car did not stop moving until they had been removed from the car and secured. Tr. at 16. Officer Seitzinger testified that he was concerned about his safety and that of Officer Porter, given all the movement, and that at least one occupant of the car was a suspected drug dealer. Tr.

0:01-3:10.

at 18.  Further, as the officers approached, Officer Porter recognized the driver of the car as a member of the Soldiers of Aryan Culture (SAC), a violent white supremacist gang known to deal in illegal narcotics.  Tr. at 20.  Officer Seitzinger approached the front passenger as Officer Porter approached on the driver's side.  *Id*.

The front passenger, who turned out to be Defendant, was moving more than the other occupants of the car.  *Id*.  Officer Seitzinger viewed her as the biggest threat, so he removed her first and secured her in handcuffs, not knowing her identity. Tr. at 16-17.  He testified that he did not immediately tell her why the car had been pulled over, due to his concern for officer safety. Tr. at 30.  Officer Seitzinger could not recall exactly what he told Defendant about the reason the car was pulled over.  *Id*.

While the officers were securing the first two passengers they encountered, backup units arrived.  Tr. at 17.  The rest of the occupants of the car were removed and secured, and the officers began to ask for identification.  Tr. at 18.  Officer Seitzinger asked Defendant for her identification.  Tr. at 19.  She replied that it was in her purse, on the floor of the front passenger seat of the car, where she had been sitting.  *Id*.  Officer Seitzinger asked Defendant if he could retrieve the identification from her purse, since her hands were in cuffs behind her back, and she said, "yes."  *Id*.  Officer Seitzinger testified that he was not going to allow a suspected drug dealer to go back to her car, unhandcuffed, to retrieve something from her purse, due to safety concerns.  Tr. at 33-34.

After Defendant gave Officer Seitzinger permission to retrieve her identification, the officer went to the car and located her purse on the floor of the car, where she said it would be.

Tr. at 24. He brought the purse back to where Defendant was standing at the side of the road and opened it.  *Id*.  Officer Seitzinger saw "lots of little Ziploc bags containing methamphetamine residue" in the purse upon opening it.  *Id*.  The bags were "in plain view all around the [defendant's] wallet" which was in the middle of the purse.  Tr. at 34. Officer Seitzinger recognized the methamphetamine from his previous experience with the drug as a law enforcement officer. Tr. at 24.  The officers field-tested the bags for methamphetamine residue, and they tested positive. *Id*.  Officer Seitzinger located a valid identification for Defendant in the purse, as well as several identifications in other people's names. Tr. at 25.

Defendant's testimony differed from that of Officer Seitzinger on these events.  For example, Defendant testified that Officer Seitzinger asked her if he could retrieve her identification, and that she replied that she would get it.  *Id*.  She testified that, despite her response, the officer got her purse from the car.  *Id*. She testified that Officer Seitzinger asked for her consent to search the purse, but when she denied consent, searched it anyway.  *Id*.  The court, however, credits Officer Seitzinger's testimony.   As stated above, Defendant admitted on the stand that she had just awoken at the time of the incident, had taken methamphetamine 12 hours before the incident, and has made numerous false statements to authorities. Tr. at 46-49.  The court finds that Defendant's testimony was not credible.

While Officer Seitzinger dealt with Defendant, Officer Porter had observed another passenger putting something into her bra and asked her what it was.  Tr. at 21.  She replied that it was methamphetamine, and Officer Porter asked her to remove it.  Tr. at 22.  Defendant and the other passenger were arrested for possession of methamphetamine.  Tr. at 26.   Following the

-6-

arrests, the car's interior was searched.  *Id*.  Officer Porter found a blue bag in the front

passenger's compartment containing several bags of methamphetamine. *Id*.   Several knives were

also found in the car, including one with an eight-inch blade. Tr. at 39.

## CONCLUSIONS OF LAW

The traffic stop of Defendant's car was valid.  "To determine the initial validity of a

traffic stop, we ask whether the stop was objectively justified." United States v. DeGasso, 369

F.3d 1139, 1143(10th Cir. 2004).  "A traffic stop is valid under the Fourth Amendment if the stop

is based on an observed traffic violation or if the police officer has reasonable articulable

suspicion that a traffic or equipment violation has occurred or is occurring."  *United States v.*

*Botero-Ospina*, 71 F.3d 783, 787 (10 Cir. 1995).  "It is . . .  irrelevant that the officer may have

had other subjective motives for stopping the vehicle."  *Id*.

In the instant case, the car in which Defendant was a passenger was pulled over because

the driver failed to activate the turn signal.  Tr. at 11.  The driver, Robert Varner, was issued a

citation by Officer Porter for Failure to Signal, a violation of Utah Traffic Code 41-6a-804. That

section reads in pertinent part:

> (1)(a) A person may not turn a vehicle or move right or left on
> a roadway or change lanes until:
> ...
> (ii) An appropriate signal has been given under this section.
> (b) A signal of intention to turn right or left or to change lanes
> shall be given continuously for at least the last two seconds
> preceding the beginning of the movement."

U.C.A. 41-6a-804. Mr. Varner violated Utah law by failing to activate his left-turn signal at all

before turning left from 400 West onto 300 South.  Tr. at 11.  Therefore, the stop of the car was

objectively justified and valid as based on an observed traffic violation.

Because Defendant contests the officer's version of events, the relative credibility of the witnesses at the hearing is perhaps the key question in resolving Defendant's motion to suppress. Determining the credibility of witnesses is a factual determination and squarely within the province and discretion of the district court. *See, inter alia, United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008).

In this case, an objective analysis of the testimony of the two witnesses at the suppression hearing, plus an examination of the supporting evidence, weighs heavily in favor of Officer Seitzinger's credibility over that of Defendant. While there are no objective factors weighing in favor of Defendant's testimony, there are several factors weighing in favor of Officer Seitzinger's version of events:

- Both Officer Seitzinger and Officer Porter observed the failure to signal. This is evidenced by Officer Seitzinger's testimony that he had observed the violation, and that he said nothing to Officer Porter before Officer Porter activated the overhead lights – right after the violation occurred. Tr. at 35- 36.   This is strong evidence of Officer Porter's simultaneous observation of the failure to signal.

- Officer Porter issued Varner, the driver, a citation for Failure to Signal. To disbelieve Officer Seitzinger's version of events, one would also have to call into question the credibility of Officer Porter, who obviously believed Varner committed the infraction, because he issued him a citation.  Tr. at 36, Ex. 2.  Further, there is no evidence that Varner contested the citation, meaning, without further evidence,

the infraction could be considered admitted to by the driver himself.

- Objective evidence – the dispatch recording – supports Officer Seitzinger on the other point in which the two testimonies are in dispute.  Officer Seitzinger testified that the patrol car they were in was the only car involved in the initial stop of Defendant's car, despite repeated calls for backup.  Tr. at 11, 17.  Defendant claimed to have seen multiple patrol cars – at least three in total – involved in the stop of her car.  Tr. at 42.  The dispatch audio recording, Ex. 1, supports Officer Seitzinger's version of events because Officer Porter can be clearly heard to request expedited backup after Defendant's car had been pulled over.  Ex. 1 at 3:03-3:10.[3] This indicates that, when Defendant's car was pulled over, Officers Seitzinger and Porter were the only law enforcement on the scene, and it calls into question Defendant's recollection of the events of that morning.

- Finally, Defendant admitted on the stand that she had awoken just prior to the stop, and that she had used methamphetamine 12 hours prior. Tr. at 46-47. This calls into question her observations at the time of the stop, as well as her present ability to recall a version of events that is accurate. She also admitted to having given false statements to police "numerous" times in her past (Tr. at 49), whereas there is nothing in Officer Seitzinger's past to indicate a willingness to lie to authorities.

Whether Defendant told falsehoods on the stand, or simply could not remember

---

[3]  Officer Porter appears to say "324, I've got about six in the car, if you could have Provo expedite, please." Ex.1 at 3:03-3:10. This comes after multiple requests from the Orem officer to his dispatcher to obtain backup from the Provo Police Department. Ex.1 at 0:01-3:00.

events accurately, the clear weight of objective evidence lies in favor of Officer Seitzinger's version of events, and therefore the court credits his testimony and not that of Defendant.

Officer Seitzinger opened Defendant's purse pursuant to her consent. As stated above, a credibility determination should weigh in favor of Officer Seitzinger, therefore his version of events regarding the initial search of Defendant's purse should also control. In his testimony, Officer Seitzinger said he asked for Defendant's permission to retrieve her identification from her purse, as she was handcuffed and he did not want to release her for safety concerns.  Tr. at 19, 33-34.  He testified that Defendant granted that permission.  Tr. at 24.  When he looked through the purse, he saw in plain sight several plastic baggies with residue that he recognized as methamphetamine.  *Id*.

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  "Under federal law, consent is valid if it is 'freely and voluntarily given.'"  *United States v. Sawyer*, 441 F.3d 890, 894 (10th Cir. 2006) (quoting *Schneckloth*, 412 U.S. at 219). "The validity of consent to search requires a factual determination based upon the totality of the circumstances of whether the consent was the product of an essentially free and unconstrained choice by the maker, or whether it was the product of duress or coercion, express or implied." *Id*. (citations omitted).

In the instant case, there is no evidence that Defendant was coerced in any way to give consent – she simply denies that she gave it.  Tr. at 45.  As stated above, the objective evidence supports Officer Seitzinger's credibility over that of Defendant.   According to Officer

Seitzinger's testimony, Defendant was in handcuffs, standing on the side of the road, and Officer Seitzinger had holstered his weapon.  Tr. at 17, 19-20, 22.  There is no evidence that he used any sort of intimidation or show of force in asking for Defendant's consent.   All credible evidence indicates that Officer Seitzinger simply asked Defendant if he could retrieve her identification, as she was in handcuffs, and she allowed it.   Once he had opened the purse to get the identification, the baggies containing drug residue were in plain sight "all around the wallet." Tr. at 34.

Finally, even if a Fourth Amendment violation occurred, the evidence inevitably would have been discovered.   "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *United States v. Martinez*, 512 F.3d 1268, 1273 (10th  Cir. 2008) (citation omitted).  "The burden rests upon the government to prove by a preponderance of the evidence that the evidence at issue would have been inevitably discovered without the Fourth Amendment violation." *Id.* (citations omitted).

While Officer Seitzinger was investigating Defendant, Officer Porter was conducting a parallel investigation of an additional passenger in the car.  Tr. at 21-22.  Officer Porter had observed that passenger putting something in her bra, and asked her what it was.  Tr. at 21.  She said it was methamphetamine and provided it to Officer Porter at his request.  Tr. at 22.  This passenger was also arrested.  Tr. at 26.  Because Defendant's car would have been lawfully searched incident to the other passenger's arrest regardless of the circumstances surrounding Defendant's arrest, the inevitable discovery doctrine applies to any evidence within the passenger compartment of the car – including Defendant's purse and the blue bag found on the floor of the

-10-

front passenger compartment.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Suppress [Docket #

16] is DENIED.

DATED this 14th day of November, 2008.

BY THE COURT:

DALE A. KIMBALL
United States District Judge